## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

---------------------------------------------------------------------x
                                                 :

**In re:**                                      :        **Chapter 11**

                                               :

**SHARPER IMAGE CORPORATION,**      :        **Case No. 08-_____ (___)**

                                               :

                 **Debtor.**                        :

                                               :
---------------------------------------------------------------------x

### DECLARATION OF REBECCA L. ROEDELL IN SUPPORT OF THE
### DEBTOR'S CHAPTER 11 PETITION AND REQUEST FOR FIRST DAY RELIEF

I, Rebecca L. Roedell, hereby declare under penalty of perjury:

1.     I am the Chief Financial Officer and Executive Vice President of Sharper Image Corporation, a Delaware corporation (the "Debtor" or "Sharper Image"). I have been employed by Sharper Image as Chief Financial Officer and Executive Vice President since June 1, 2007. In that capacity, I am familiar with Sharper Image's day-to-day operations, business, and financial affairs.

2.     Concurrently with the filing of this declaration (the "Declaration"), the Debtor has filed in this Court a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). In order to enable the Debtor to operate effectively and minimize certain of the potential adverse effects of the commencement of the reorganization case, the Debtor has requested certain relief in "first day" applications and motions filed with the Court (the "First Day Pleadings"). The First Day Pleadings, described in detail below, seek, among other things, to ensure the continuation of the Debtor's cash management system and other business operations without interruption, preserve vendor and customer relationships, maintain employee morale and confidence, and establish certain other

administrative procedures to promote a seamless transition into chapter 11. Such relief will be critical to the Debtor's restructuring efforts.

3.    This Declaration is submitted to assist the Court and other parties in interest in understanding the circumstances that compelled the commencement of this chapter 11 case and in support of (i) the Debtor's petition for relief under the Bankruptcy Code filed on the date hereof (the "Commencement Date") and (ii) the First Day Pleadings. Any capitalized term not defined herein shall have the meaning ascribed to that term in the relevant First Day Pleading. Except as otherwise indicated herein, all facts set forth in this Declaration are based on my personal knowledge, my discussions with other members of the Debtor's senior management, my review of relevant documents, or my opinion based on my experience, knowledge, and information concerning Sharper Image's operations and financial condition. If called upon to testify, I could and would testify competently to the facts set forth in this Declaration. I am authorized to submit this Declaration on behalf of Sharper Image.

4.    This Declaration is intended to provide a summary overview of Sharper Image and the commencement of the chapter 11 case. Parts I through IV of this Declaration provide an overview of Sharper Image's business, organizational structure, capital structure, and the circumstances giving rise to the commencement of this chapter 11 case. Part V summarizes the First Day Pleadings filed concurrently herewith.

## I.

### Sharper Image's Business

5.    Founded in 1977, Sharper Image is a multi-channel specialty retailer that is nationally and internationally renowned as a leading source of new, innovative, high-quality products. It conducts its business through three principal selling channels:  Sharper Image

specialty stores located throughout the United States; the Sharper Image monthly catalog; and the Internet, through its primary website, www.sharperimage.com.

Specialty Stores

6.     Sharper Image currently operates 184 stores in 38 states and the District of Columbia.  Of the 184 stores, 4 are outlet stores, which are used to sell slow-moving, discontinued, reconditioned, and irregular merchandise.  Store sales generate the highest proportion of Sharper Image's total sales, representing approximately 70.8% of total sales for the year ended January 31, 2008 ("Fiscal 2007"), approximately 61.4% for the year ended January 31, 2007 ("Fiscal 2006"), and approximately 62.6% for the year ended January 31, 2006 ("Fiscal 2005").

Catalog Operations

7.     Sharper Image's catalog operations, which began in 1979, include revenues generated directly from its product catalog, as well as other direct marketing sources, including single product mailers and print ads.  Sharper Image mails its award-winning catalog to an average of three to four million individuals each month, with increases during Father's Day, graduation months, and the fourth quarter holiday season.  Catalog recipients often order products they identify in the catalog through the Internet or acquire the products after visiting retail stores at which they can see and test the products.  Catalog distribution has served as the principal form of marketing for Sharper Image.  Sharper Image's catalog operations generated approximately 7% of its total sales in Fiscal 2007, approximately 14.9% in Fiscal 2006, and approximately 13.5% in Fiscal 2005.

Internet Operations

       8.     Sharper Image has participated in Internet retailing and online shopping since 1994 and has maintained its own website at www.sharperimage.com since 1995. Sales from Sharper Image's Internet operations generated approximately 14.9% of its total sales in Fiscal 2007, approximately 16.8% in Fiscal 2006, and approximately 16.5% in Fiscal 2005.

Other Operations

       9.     In addition to its store, catalog, and Internet operations, Sharper Image conducts (i) a business-to-business operation, which includes wholesale operations and its Sharper Image Corporate Incentives and Rewards Program, (ii) a customer-list rental program, and (iii) a brand licensing program. Through its recently created Brand Licensing Division, Sharper Image licenses the Sharper Image brand with select third parties to allow them to sell Sharper Image branded products in other channels of distribution.

Merchandising

      10.     In recent years, Sharper Image's success has depended substantially on a few products, namely its air-purification line of products and its massage chair line of products. The former accounted for 9.4% of revenues in Fiscal 2007, 23.4% in Fiscal 2006, and 27.7% in Fiscal 2005, and the latter accounted for 5.2% of revenues in Fiscal 2007, 6.3% in Fiscal 2006, and 9.1% in Fiscal 2005. Substantially all of Sharper Image's proprietary products are produced on a purchase order basis by manufacturers in Asia, primarily China. Sharper Image relies heavily on a single supplier for substantially all of its air-purification line of products as well as a number of other products.

Advertising

11.     Sharper Image's catalog remains its primary advertising vehicle.  It also uses multimedia advertising, including newspapers, magazines, e-mail marketing programs, Internet advertising, point of sale advertising, and business-to-business trade publications. Sharper Image utilizes public relations to garner product placement on television, on the radio, and in the print media.

## II.

## Organizational Structure

12.     Sharper Image has only one subsidiary, which is incorporated in Hong Kong and is not a party to the chapter 11 case.  A process to wind down the subsidiary has begun.

13.     Sharper Image maintains its principal offices in San Francisco, California. It has product development offices in Northern California, owns a distribution facility in Little Rock, Arkansas, and leases distribution and warehouse functions in Little Rock, Arkansas and Ontario, California.  Sharper Image Hong Kong Ltd., a non-Debtor subsidiary, maintains an office in Hong Kong.  Sharper Image does not maintain substantial assets outside the United States.

14.     As of February 18, 2008, Sharper Image had approximately 2,246 employees in the United States.

## III.

## Capital Structure

15.     The material indebtedness of Sharper Image consists of the Amended and Restated Loan and Security Agreement.

16.     As of the Commencement Date, Sharper Image, as borrower, is a party to that certain Loan and Security Agreement, dated as of October 31, 2003, as amended and restated in its entirety on May 25, 2007 and August 20, 2007 (the "Prepetition Credit Agreement"), with Wells Fargo Retail Finance, LLC ("Wells Fargo"), as lender, arranger, and administrative agent, and the lenders party thereto. The Credit Agreement provides for (i) a revolving credit facility (and letter of credit subfacility) that provides for borrowings against a "borrowing base" determined by inventory levels and specified accounts receivable (the "Revolving Credit Facility") in the maximum aggregate amount of the lesser of (a) $85 million during the period from January 1 through July 31 of each year, (b) $100 million during the period from August 1 through September 30 of each year, (c) $120 million during the period from October 1 through December 31 of each year, and (d) the borrowing base, and (ii) a term loan facility (the "Term Loan," and together with the Revolving Credit Facility, the "Prepetition Credit Facility") in the amount of $20 million, $10 million of which was made immediately available, with the balance of $10 million to be available on the completion of syndication of the loan. The contemplated syndication did not occur.

17.     The amounts borrowed under the Prepetition Credit Agreement were used to fund, among other things, working capital requirements. As of the Commencement Date, approximately $44.5 million is outstanding under the Prepetition Credit Agreement.

18.     Pursuant to the Prepetition Credit Agreement, generally Sharper Image granted first priority liens and security interests in favor of Wells Fargo in Sharper Image's then owned or thereafter acquired right, title, and interest in and to each of the following assets:  (i)

Accounts,[1] (ii) Books, (iii) Deposit Accounts, (iv) Equipment, (v) General Intangibles (including

the trade name), (vi) Inventory, (vii) Investment Property (including all securities and Securities

Accounts), (viii) Negotiable Collateral, (ix) money or other assets of Sharper Image, and (x) the

proceeds and products of any of the foregoing, including proceeds of insurance covering any or

all of the foregoing, and any and all of the above resulting from the sale, exchange, collection, or

other disposition of any of the foregoing, or any portion thereof or interest therein, and the

proceeds thereof.

Recent Financial Information

19.    As of January 31, 2008, Sharper Image's unaudited financial statements

reflected assets totaling approximately $251.5 million and liabilities totaling approximately $199

million.  As of January 31, 2008, Sharper Image reported cash, cash equivalents of

approximately $0.7 million.

20.    Sharper Image is a reporting company under Section 12(b) of the

Securities and Exchange Act of 1934.  Sharper Image's common stock is publicly traded on the

NASDAQ Global Market under the symbol "SHRP."  As of the Commencement Date, there are

15,172,523 shares of Sharper Image's common stock outstanding.

## IV.

## Events Leading to the Chapter 11 Case

21.    Sharper Image has experienced declining sales and profitability over the

last several years.  Unfortunately, Sharper Image is in a severe liquidity crisis that is attributable

to a host of factors, including, among others, increased competition, and deteriorating gross

margins, the negative impact of pending litigation and resultant loss of consumer/market

---

[1] Capitalized terms used in this section but not defined herein shall have the meanings ascribed to
such terms in the Prepetition Credit Agreement.

confidence, contraction of credit from vendors and suppliers, and maintenance and increases in the number of noncontributing stores. The foregoing has been compounded by the ever-tightening and volatile credit and financing markets.

22.     Sharper Image has experienced steady sales declines since 2004 with resulting net losses in Fiscal 2005, Fiscal 2006 and Fiscal 2007. The trend continues in 2008. Sharper Image has experienced an 11% decrease in comparable store sales and a 23% decrease in total company sales for the month of January (versus 2007). Sharper Image's comparable store sales have declined for the past three fiscal years, decreasing 13.0% in Fiscal 2007, 25.4% in Fiscal 2006, and 16.0% in Fiscal 2005.

23.     Sharper Image's declining revenues and increased losses may be attributed, in significant part, to its air-purification products. The air-purification products were one of Sharper Image's highest margin products. The decrease in sales of this line of products was due to many factors, including pending class action litigations brought against Sharper Image based on the performance, effectiveness, and safety of its Ionic Breeze air purifiers, resulting in negative publicity and a decrease in total revenues.

24.     The class actions on behalf of purchasers of the Ionic Breeze were filed in state courts in San Francisco, California (the "San Francisco State Court Action") and Jacksonville, Florida (the "Florida State Court Action"), as well as federal courts in the District of Maryland (the "Maryland District Court Action"), the Southern District of Florida-Miami Division (the "Florida District Court Action"), and the Central District of California (the "California District Court Action," and collectively, the "Class Action Lawsuits"). As of the Commencement Date, only the San Francisco State Court Action has been certified for class representation. The Florida State Court Action was stayed pending resolution of the San

Francisco State Court Action. The Maryland District Court Action and the California District Court Action have been dismissed. The Florida District Court Action is currently pending.

25.    As to the Florida District Court Action, on January 16, 2007, Sharper Image entered into a Settlement Agreement and Release (as amended, the "Settlement") with the class action plaintiffs. The Settlement would have required Sharper Image to (i) pay up to $1.9 million to the plaintiffs' attorneys for fees and expenses, (ii) make available free Ozone Guard attachments, (iii) issue $19 merchandise credits, subject to certain terms and conditions, to members of the Settlement class, and (iv) agree to certain other measures. Following a fairness hearing on October 11, 2007, the Florida District Court rejected the Settlement.

26.    The rejection of the Settlement caused Sharper Image's stock price to drop, reflecting a significant loss in market confidence. As analysts began to speculate regarding the exposure to liability in the absence of a settlement, support from Sharper Image's trade vendors and suppliers weakened. Sharper Image's vendors and suppliers contracted credit terms, or retracted them altogether, thus severely affecting Sharper Image's working capital. Sharper Image deals with approximately 650 vendors and suppliers on a credit basis, many of which began to request payment of cash on delivery, thus significantly restricting Sharper Image's ability to procure the products needed to operate at profitable levels.

27.    Sharper Image's liquidity crisis has also been exacerbated by the contracted availability under the Prepetition Credit Facility.

28.    The severe liquidity constraints facing Sharper Image resulting from its declining sales and profitability, loss of consumer confidence, and restrictive trade terms have been further restricted by the continued maintenance of and increasing number of underperforming or nonperforming stores. Sharper Image's management has determined in its

reasonable business judgment that approximately 90 stores are noncontributors and that it is in

the best interests of all stakeholders that such stores be closed as soon as possible after sale of the

store inventories.  Negotiations are ongoing to arrange for the sale and disposition of the

nonproductive stores and inventories.  Sharper Image intends to file with this Court a motion to

approve the sale process as soon as possible.

29.    Sharper Image believes it is in the best interests of all stakeholders to

commence a chapter 11 case.  Chapter 11 will enhance Sharper Image's ability to effectively

deal with the nonproductive stores, reject lease obligations that are not in the best interests of

Sharper Image, and apply the provisions of chapter 11 to maximize the value of its estate.

## V.

### Summary of First Day Pleadings

30.    Concurrently with the filing of its chapter 11 petition, Sharper Image has

filed, for the Court's approval, a number of proposed orders (the "First Day Orders"), which

Sharper Image believes are necessary to enable it to operate with a minimum of disruption and

loss of productivity.  Sharper Image requests that each of the First Day Orders be entered as

critical elements in stabilizing and facilitating Sharper Image's operations during the pendency

of the chapter 11 case.  A description of the relief requested and the facts supporting each of the

First Day Orders is set forth below.

*Motion of Debtor Pursuant to Sections 105(a), 363(c), and 345(b) of the Bankruptcy*
*Code for Order (I) Authorizing Debtor to (A) Continue Existing Cash Management*
*System and (B) Maintain Existing Bank Accounts and Business Forms and*
*(II) Granting Waiver of the Requirements of Section 345(b) of the Bankruptcy Code*

31.    The Debtor requests that the Court enter an interim order (A) authorizing

the Debtor to (i) continue to operate its centralized cash management system (the "Cash

Management System"); (ii) fund Sharper Image's operations; and (iii) maintain the Debtor's

existing bank accounts (the "Bank Accounts") and business forms and (B) waiving the requirements of section 345(b) of the Bankruptcy Code.

32.     In the ordinary course of business, the Debtor uses the Cash Management System to efficiently collect, transfer, and disburse funds generated by its business operations. Any disruption of the Debtor's Cash Management System, including the closure of its Bank Accounts, would be detrimental to the Debtor's operations.  Because the Debtor conducts business through retail stores around the United States that generate money from customer sales and because the Cash Management System is in sync with Sharper Image's national operations, it would be extremely difficult and expensive to establish and maintain a different cash management system.

33.     Also, if the Debtor was required to comply with the Office of the United States Trustee's "Operating Guidelines and Financial Reporting Requirements Required in All Cases Under Chapter 11," its operations would be severely harmed by the disruption, confusion, delay, and cost that would most certainly result from the closure of its existing bank accounts, the opening of new accounts, and the immediate printing of new checks with a "Debtor in Possession" designation on them.  Because the Debtor believes that investment of the funds, if any, in the Stagecoach Sweep Account managed by Wells Fargo will provide the protection contemplated by section 345(b) of the Bankruptcy Code, the Debtor seeks a waiver of the "corporate surety" requirement.

34.     The relief requested in this motion is vital to ensuring the Debtor's seamless transition into bankruptcy.  Authorizing the Debtor to maintain its Cash Management System will avoid many of the possible disruptions and distractions that could divert the Debtor's attention from more pressing matters during the initial days of the chapter 11 case.

35.     I believe that the relief requested in the cash management motion is in the best interests of the Debtor's estate and creditors and is both necessary and appropriate to the efficient administration of this case and the Debtor's reorganization efforts.

### *Motion of Debtor Pursuant to Sections 105(a) and 363(b) of the Bankruptcy Code for an Order (I) Authorizing Payment of Wages, Compensation, and Employee Benefits and (II) Authorizing Financial Institutions to Honor and Process Checks and Transfers Related to Such Obligations*

36.     The Debtor requests, pursuant to sections 105(a) and 363(b) of the Bankruptcy Code, that the Court authorize the Debtor to (a) honor and pay, in its sole discretion, (i) obligations relating to wages, salary, and compensation for its employees; (ii) monthly and/or quarterly commissions to sales staff; (iii) payroll taxes owed to various taxing authorities; (iv) certain expense reimbursements; and (v) amounts under various benefit plans and policies for its employees, and all costs incident to the foregoing, and (b) maintain and continue to honor its practices, programs, and policies for its employees as they were in effect as of the Commencement Date, and as such may be modified, amended, or supplemented from time to time in the ordinary course.

37.     As of February 18, 2008, the Debtor employed approximately 2,246 individuals, of which 977 are full-time employees, 1,065 are part-time employees, 186 are on-call employees, 10 are on leave of absence, four are temporary full-time employees, and four are temporary part-time employees.  The continued operation of the Debtor's business and its successful reorganization depends largely upon the retention of the services of these employees and the maintenance of employee morale and cooperation.  Consequently, it is critical that the Debtor be authorized to satisfy its employee-related obligations and continue its ordinary course employee plans, policies, and programs in effect as of the Commencement Date.

38.     Moreover, if the checks issued and fund transfers requested in payment of the prepetition employee obligations are dishonored, or if such earned obligations are not timely paid postpetition, the Debtor's employees could suffer extreme personal hardship and may even be unable, in some instances, to pay their daily living expenses.  In addition, it would be inequitable to require the Debtor's employees to bear personally the cost of any business expenses they incurred prepetition for the benefit of the Debtor with the understanding that they would be reimbursed.

39.     I believe that the authority to pay all employee obligations in accordance with the Debtor's prepetition business practices is in the best interests of the Debtor and its estate and will enable the Debtor to continue to operate its business in chapter 11 without disruption.

***Motion of Debtor Pursuant to Sections 105(a), 362(d), 363(b), and 503(b
of the Bankruptcy Code for Authority to (I) Continue the Debtor's Workers'
Compensation Program and Its Liability, Product, Property, and Other
Insurance Programs and (II) Pay All Prepetition Obligations In Respect Thereof***

40.     The Debtor requests, pursuant to sections 105(a), 362(d), 363(b), and 503(b) of the Bankruptcy Code, to continue its workers' compensation program and various liability, product, property, directors' and officers' liability, and other insurance programs.  In furtherance of this request, the Debtor requests that the Court authorize its banks to receive, honor, process, and pay any and all checks drawn, or electronic fund transfers requested or to be requested, on the Debtor's general disbursement accounts to the extent that such checks or electronic fund transfers relate to any of the Debtor's insurance programs.

41.     The nature of the Debtor's business and the extent of its operations make it essential for the Debtor to maintain its insurance programs on an ongoing and uninterrupted basis.  The nonpayment of any premiums, deductibles, or related fees under one of the insurance programs could result in one or more of the insurance carriers declining to renew their insurance

policies or refusing to enter into new insurance agreements with the Debtor in the future. If the

insurance programs are allowed to lapse without renewal, the Debtor could be exposed to

substantial liability for damages resulting to persons and property of the Debtor and others,

which exposure could have an extremely negative impact on the Debtor's ability to successfully

reorganize. Indeed, if such a lapse were to occur, the Debtor would be faced with acquiring

replacement policies on an expedited basis at a significant cost to the estate. Accordingly, the

Debtor must make all payments in respect of the insurance programs as continuation of these

policies is essential to the ongoing operation of the Debtor's business.

42.    I believe that the authority to pay the insurance programs in accordance

with the Debtor's prepetition business practices is in the best interests of the Debtor and its estate

and will enable the Debtor to continue to operate its business in chapter 11 without disruption.

### Motion of Debtor Pursuant to Sections 105(a) and 366 of the Bankruptcy Code for Order (I) Prohibiting Utilities from Altering, Refusing, or Discontinuing Service, (II) Deeming Utilities Adequately Assured of Future Performance, and (III) Establishing Procedures for Determining Adequate Assurance of Payment

43.    The Debtor seeks entry of an interim order, pursuant to sections 105(a)

and 366 of the Bankruptcy Code, (i) determining that the Debtor's utility companies have been

provided with adequate assurance of payment within the meaning of section 366 of the

Bankruptcy Code pending the entry of a final order; (ii) approving the Debtor's proposed offer of

adequate assurance and procedures governing the any additional or different requests for

adequate assurance by the utilities companies; (iii) prohibiting the utility companies from

altering, refusing, or discontinuing services on account of prepetition amounts outstanding or on

account of any perceived inadequacy of the Debtor's proposed adequate assurance pending entry

of a final order; (iv) determining the Debtor is not required to provide any additional adequate

assurance beyond what is proposed by its motion pending entry of a final order; (v) establishing

procedures for the utility Companies to seek to opt out of the Debtor's proposed adequate

assurance procedures; and (vi) scheduling a final hearing on the motion to consider the relief

requested.

44.    Given that the Debtor operates 184 stores and has multiple distribution

and warehouse facilities to service its customers, uninterrupted utility services are essential to the

Debtor's ongoing operations and the success of the Debtor's reorganization.  Should any utility

company refuse or discontinue service, even for a brief period, the Debtor's business operations

could be severely disrupted, and such disruption would jeopardize the Debtor's reorganization

efforts.  It is essential that the utility services continue uninterrupted during the chapter 11 case.

45.    I believe that the authority to pay the utility programs in accordance with

the Debtor's prepetition business practices is in the best interests of the Debtor and its estate and

will enable the Debtor to continue to operate its business in chapter 11 without disruption.

### *Motion of Debtor Pursuant to Sections 105(a), 363(b), and 541 of the Bankruptcy Code for Authorization to Pay Prepetition Sales and Use Taxes*

46.    The Debtor seeks entry of an order, pursuant to sections 105(a), 363(b),

and 541 of the Bankruptcy Code, authorizing it to pay all prepetition sales and use tax

obligations to various state and local taxing authorities, including those sales and use tax

obligations subsequently determined upon audit to be owed for periods prior to the

commencement date.

47.    Payment of the prepetition sales taxes and use taxes is critical to the

Debtor's continued, uninterrupted operations.  Nonpayment of these obligations may cause

taxing authorities to take precipitous action, including, but not limited to, filing liens, preventing

the Debtor from conducting business in the applicable jurisdictions, seeking to lift the automatic

stay, and imposing personable liability on the Debtor's officers and directors, all of which would

disrupt the Debtor's day-to-day operations and could potentially impose significant costs on the Debtor's estate.

48.    I believe that the authority to pay the taxing authorities in accordance with the Debtor's prepetition business practices is in the best interests of the Debtor and its estate and will enable the Debtor to continue to operate its business in chapter 11 without disruption.

### Motion of Debtor Pursuant to Sections 105(a) and 363(b) of the Bankruptcy Code for Authorization to (I) Pay Prepetition Obligations Owed to Certain Foreign Creditors and (II) Authorize Financial Institutions to Honor and Process Related Checks and Transfers

49.    The Debtor requests, pursuant to sections 105(a) and 363(b) of the Bankruptcy Code, the authority to (i) pay prepetition obligations owed to certain foreign vendors and suppliers and other entities in various jurisdictions outside of the United States in the ordinary course of business, and (ii) authorize its banks to receive, process, honor, and pay checks or electronic transfers used by the Debtor to pay prepetition obligations to such foreign creditors.

50.    The goods provided by the Debtor's foreign vendors are integral to the operation of the Debtor's business, as a vast majority of the Debtor's proprietary products (including substantially all of its air-purification line of products) are supplied on a purchase order basis by suppliers in Asia, primarily China.  The Debtor relies on this select group of suppliers to supply these products in sufficient quantities to meet customer demand and deliver these products in a timely manner.  If the Debtor were unable to obtain products from these suppliers on a timely basis or on commercially reasonable terms, the Debtor's operating results would be adversely affected.

51.     I believe that the authority to pay the foreign creditors in accordance with the Debtor's prepetition business practices is in the best interests of the Debtor and its estate and will enable the Debtor to continue to operate its business in chapter 11 without disruption.

***Motion to Debtor Pursuant to Sections 105, 363(b), 363(c), and 503(b) of the Bankruptcy Code for Order (I) Granting Administrative Expense Status to Debtor's Undisputed Obligations to Vendors Arising From Postpetition Delivery of Goods Ordered Prepetition and Authorizing Debtor to Pay Such Obligations in Ordinary Course of Business; (II) Authorizing Payment of Prepetition Customs Duties, Broker's Fees, and Freight Forward Charges; and (III) Authorizing Payment of Prepetition Common Carriers and Product Servicers***

52.     The Debtor requests, pursuant to sections 105, 363(b), 363(c), and 503(b) of the Bankruptcy Code, the authority to grant its vendors administrative expense priority status for undisputed obligations arising from the postpetition delivery of goods and services ordered in the prepetition period and authorizing the Debtor to pay such obligations in the ordinary course of business.  In addition, the Debtor seeks authority to (i) pay prepetition customs duties, broker's fees, freight forward charges, and ocean freight charges; and (iii) pay prepetition obligations to its common carriers and product servicers.

53.     In connection with the normal operation of its business, the Debtor relies substantially on providers of goods including, but not limited to, manufacturers and suppliers, as well as packagers, transporters, and product servicers.  Any delay in the timely delivery of goods resulting from the retention of such goods by the Debtor's common carriers, customs brokers, freight forwarders, and product servicers could disrupt the Debtor's operations.  An uninterrupted supply of the Debtor's products in a timely fashion to its customers and its retail locations is vital to the Debtor's continuing operations and integral to the success of the Debtor's chapter 11 cases.

54.     I believe that the authority to pay the Debtor's common carriers, customs brokers, freight forwarders, and product servicers in accordance with the Debtor's prepetition

business practices is in the best interests of the Debtor and its estate and will enable the Debtor to continue to operate its business in chapter 11 without disruption.

### *Motion of Debtor Pursuant to Sections 105(a), 363(b), and 503(b)(1) of the Bankruptcy Code for Authorization to Honor Certain Prepetition Customer Programs*

55.    The Debtor requests, pursuant to sections 105(a), 363(b), and 503(b)(1) of the Bankruptcy Code, authority to continue its customer programs in the ordinary course of business and to perform and honor its prepetition obligations thereunder.  Both in the ordinary course of business and as customary in the retail industry, the Debtor engaged in certain activities to develop and sustain a positive reputation with the consumers and wholesale customers to whom the Debtor markets its products.  To that end, the Debtor implemented various customer programs and policies designed to ensure customer satisfaction, drive sales, meet competitive pressures, develop and sustain customer loyalty, improve profitability, and generate goodwill for the Debtor and its products, thereby retaining current customers, attracting new ones, and ultimately enhancing net income.

56.    The benefits of the customer programs are integral to the Debtor's efforts to stabilize its business, restore vitality, and ultimately deliver the most value to all stakeholders in this chapter 11 case.  The Debtor believes it must quickly assure its customers of its commitment to fulfill its obligations under the prepetition customer programs in order to maintain its valuable customer relationships.

57.    I believe that the authority to continue the Debtor's customer programs in accordance with the Debtor's prepetition business practices is in the best interests of the Debtor and its estate and will enable the Debtor to continue to operate its business in chapter 11 without disruption.

***Motion of Debtor (A) for Authorization to (I) Obtain Postpetition Financing
Pursuant to 11 U.S.C. § 364; (II) Utilize Cash Collateral Pursuant to 11 U.S.C § 363;
(III) Grant Priming Liens and Superpriority Claims to DIP Secured Parties Pursuant to
11 U.S.C. § 364(c) and (d); (IV) Provide Adequate Protection pursuant to 11 U.S.C. §§ 361,
362, 363, and 364 and (B) to Schedule a Final Hearing Pursuant to Bankruptcy Rule 4001***

58.     The Debtor requests entry of interim and final orders authorizing the

Debtor to, among other things, (i) obtain postpetition financing pursuant to sections 105, 361,

362, 364(c)(1), 364(c)(2), 364(c)(3), 364(d), and 507 of the Bankruptcy Code on an interim basis

in an amount up to $35 million and on a final basis in the aggregate committed amount of up to

$60 million; (ii) use cash collateral pursuant to section 363 of the Bankruptcy Code; and (iii)

grant adequate protection pursuant to sections 361, 362, 363, 364, and 507 of the Bankruptcy

Code to Wells Fargo, as agent for the Debtor's prepetition lenders, and the prepetition lenders.

Pending a final hearing on this request, the financing will be implemented on an interim basis

pursuant to a debtor-in-possession loan and security agreement.

59.     Prior to the Commencement Date, the Debtor surveyed various sources of

postpetition financing, including financing from its prepetition secured lenders and other third

parties.  In exploring those options, the Debtor recognized that the obligations owed to the

prepetition secured lenders are secured by virtually all of the Debtor's property, such that either

(i) the liens of the prepetition secured lenders would have to be primed to obtain postpetition

financing; (ii) the postpetition lender would be required to refinance the obligations of the

prepetition secured lenders in full and provide additional loan availability; or (iii) the Debtor

would have to find a postpetition lender willing to extend credit that would be junior to the

prepetition secured lenders' liens.  Because the prepetition secured lenders advised the Debtor's

representatives that it would not consent to be primed by another lender group, borrowing from

another postpetition lender or lending group that required liens and claims senior to that of the

prepetition secured lenders likely could only be accomplished through an extended, contested hearing to determine whether compliance with the requirements of section 364(d) of the Bankruptcy Code had been satisfied.

60.     Wells Fargo, together with a group of other lenders, is willing to extend postpetition financing on the terms and conditions described herein and thus prime its own prepetition security interests during the interim period.  The Debtor has concluded that the Wells Fargo proposal is desirable because, among other things, it permits the Debtor to secure necessary postpetition financing to continue operations and avoid an extended, contested hearing under section 364(d) of the Bankruptcy Code.

61.     Accordingly, I believe that the authority to enter into the proposed postpetition financing agreement is in the best interests of the Debtor and its estate and will enable the Debtor to continue to operate, and reorganize, its business in chapter 11 without disruption.

***Motion of Debtor Pursuant to Rule 1007 and 2002(d) of the Federal Rules of Bankruptcy Procedure and Local Bankruptcy Rule 1007-1 for (I) Extension of Time to File Schedules of Assets and Liabilities, Schedule of Executory Contracts and Unexpired Leases, and Statement of Financial Affairs and (II) Waiver of Requirements to File List of Equity Security Holders and Provide Notice of Order for Relief to Equity Security Holders***

62.     The Debtor requests, pursuant to section 521 of the Bankruptcy Code and Bankruptcy Rule 1007(c) and Local Bankruptcy Rule 1007-1(b), (i) an extension of time to file, within 15 days of the Commencement Date, its (a) schedules of assets and liabilities; (b) schedule of current income and expenditures; (c) schedule of executory contracts and unexpired leases; and (c) statement of financial affairs, and (ii) a waiver of requirements to file list of equity security holders and provide notice of order for relief to equity security holders.

63.    While the Debtor is mobilizing its employees to work diligently and expeditiously on the preparation of its schedule and statement of financial affairs, resources are strained.  In view of the amount of work entailed in completing the schedules and statement and the competing demands on the Debtor's employees to assist in efforts to stabilize business operations during the initial postpetition period, the Debtor likely will not be able to properly and accurately complete its schedules and statements within the time period imposed under the applicable procedural rules.  Therefore, the Debtor is requesting a sixty day extension of the applicable time period.  Moreover, the Debtor submits that preparing a list of its equity security holders (which can change on a daily basis) with last known addresses and sending notice to all parties on the list will be expensive and time consuming.  The Debtor further submits that if it becomes necessary for such equity security holders to file proofs of interest, they will be provided with notice of the bar date and then will have an opportunity to assert their interests.

64.    Accordingly, I respectfully submit that (i) ample cause exists for the requested extension for filings its statement and schedule of financial affairs, and (ii) ample cause exists for the Court to waive the requirement to file the list of equity security holders and the requirement to send notice of the order for relief to all equity security holders.

### *Motion of Debtor Pursuant to Sections 331 and 105(a) of the Bankruptcy Code for Administrative Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses of Professionals*

65.    The Debtor requests, pursuant to sections 105(a) and 331 of the Bankruptcy Code and Bankruptcy Rule 2016(a), entry of an order establishing procedures for the compensation and reimbursement of attorneys and other professionals whose retentions are approved by this Court pursuant to section 327 or 1103 of the Bankruptcy Code on a monthly basis, on terms that satisfy the requirements of Local Bankruptcy Rule 2016-2.  Such an order

will streamline the professional compensation process and enable the Court and all other parties to monitor more effectively the professional fees incurred in this chapter 11 case. In addition, the Debtor seeks approval of a procedure for reimbursement of reasonable out-of-pocket expenses incurred by members of any statutory committee appointed in this case.

66.    The Debtor's chapter 11 case presents a number of complex issues that, together with the day-to-day administration of the chapter 11 case, must be addressed by the Debtor's limited staff and resources. In addition, it is anticipated that several professionals will be involved. Absent streamlined compensation procedures, the professional fee application and review process could be exceptionally burdensome on the Debtor, the professionals, the Court, and other parties.

67.    I believe that the authority to enter into the proposed interim compensation procedures for the Debtor's professionals is in the best interests of the Debtor and its estate and will enable the Debtor to continue to operate, and effectively reorganize, its business in chapter 11 without disruption.

### *Motion of Debtor Pursuant to Sections 105(a), 342(a), and 521(a)(1) of the Bankruptcy Code, Bankruptcy Rules 1007(a) and 2002(a), (f), and (l), and Local Rule 1007-2 for (I) Waiver of Requirement for Filing List of Creditors and (II) Authority to Establish Procedures for Notifying Creditors of Commencement of Debtor's Chapter 11 Case*

68.    The Debtor requests , pursuant to sections 105(a), 342(a), and 521(a)(1) of the Bankruptcy Code; Bankruptcy Rules 1007(a) and 2002(a), (f), and (l), and Local Bankruptcy Rules 1007-2, (i) a waiver of the requirement to file a list of creditors on the Commencement Date and (ii) authority to implement certain procedures for notifying creditors of the commencement of the Debtor's chapter 11 case and of the meeting of creditors to be held pursuant to section 341 of the Bankruptcy Code.

69.     As described below, the Debtor has filed a motion to retain and employ Kurtzman Carson Consultants LLC as claims and noticing agent in this chapter 11 case pursuant to section 156(c) of title 28 of the United States Code.  As soon as practicable after the Commencement Date, the Debtor will furnish the list of creditors to Kurtzman Carson Consultants LLC so that it may undertake the mailing of the notice of commencement to all the Debtor's creditors.  Because Kurtzman Carson Consultants LLC will send the notice of commencement to all the Debtor's creditors as set forth on the list of creditors, the Debtor requests that this Court waive the applicable procedural rules.

### *Application of Debtor Pursuant to 28 U.S.C. § 156(c) and Local Rule 2002-1(f) for Authorization to (I) Employ and Retain Kurtzman Carson Consultants LLC as Claims and Noticing Agent for the Debtor and (II) Appoint Kurtzman Carson Consultants LLC as Agent of the Bankruptcy Court*

70.     The Debtor requests, pursuant to 28 U.S.C. § 156(c) and Local Rule 2002-1(f), authorization to (i) employ and retain Kurtzman Carson Consultants LLC as claims and noticing agent for the Debtor and (ii) to appoint Kurtzman Carson Consultants LLC as agent of the Bankruptcy Court.

71.     I believe that the retention and appointment of Kurtzman in connection with the administration of this chapter 11 case is in the best interests of the Debtor and its estate and will enable the Debtor to continue to operate its business in chapter 11 without disruption.

### Conclusion

72.     I believe that approval of the First Day Orders is in the best interests of all stakeholders.

73.     I declare under penalty of perjury that this Declaration is true and correct

to the best of my knowledge, information, and belief.

By:     _____
Rebecca L. Roedell
Executive Vice-President &
Chief Financial Officer
Sharper Image Corporation