# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| TSIC, Inc., f/k/a Sharper Image Corporation, | ) | Case No. 08-10322(KG) |
| | ) | |
| Debtor. | ) | |
| _____) | | **Re Dkt No. 907** |

## MEMORANDUM OPINION[1]

On May 29, 2008, the Official Committee of Unsecured Creditors ("the Committee") entered into an independent settlement agreement, with the "Joint Venture," a potential and ultimately approved purchaser of all of the Debtor's assets. The Committee subsequently filed a motion to approve the settlement agreement.[2] The United States Trustee (the "UST") objected, arguing that the settlement agreement contravenes the intention of the Bankruptcy Code generally, and conflicts with the absolute priority rule specifically. For the reasons set forth below, the Court will approve the proposed settlement.

## BACKGROUND FACTS

The Debtor, Sharper Image Corporation, filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code on February 19, 2008. The Debtor continues to operate as a debtor-in-possession, but has ceased its operations. No trustee or examiner has been appointed in the case. On February 27, 2008, the UST appointed the Committee (D.I. 86).

---

[1] This Memorandum Opinion constitutes the findings of fact and conclusions of law required by Federal Rule of Bankruptcy Procedure 7052.

[2] See Motion of the Official Committee of Unsecured Creditors Pursuant to Section 105(a) of the Bankruptcy Code and Bankruptcy Rule 9019 for Entry of an Order Approving Letter Agreement Between the Official Committee of Unsecured Creditors and the Joint Venture (D.I. 907).

### A. First and Second Auctions And Sale Of Debtor's Assets

In March, 2008, following an auction and sale hearing, the Debtor entered into a liquidation agreement with the successful auction bidder, comprised of Hilco Merchant Resources LLC and Gordon Brothers Retail Partners LLC (the "Joint Venture"), to conduct the store closing sales for 96 of the Debtor's 184 stores.

In April 2008, the Debtor proposed a sale ("the Sale") of, *inter alia*, the inventory in all its remaining stores and its intellectual property ("IP") through an auction to be held on May 28, 2008. As part of that process, the Debtor negotiated a "stalking horse" agreement with the Joint Venture, with an opening bid of $51.25 million. However, on the afternoon of May 27, 2008, a document was discovered that challenged the Debtor's rights to use and transfer certain intellectual property (the "IP Issue"). The IP Issue resulted in the Joint Venture revoking its original bid and entering into a revised stalking horse agreement with an opening bid of $42.5 million.

During the negotiations of the revised bid and following its execution, the Committee advised the Debtor and the Joint Venture that the Committee was prepared to file an objection to the revised agreement. A sale at the lower price would yield no benefit to the estate insofar as it would substantially reduce, or quite possibly altogether eliminate, any distribution to unsecured creditors.

At the conclusion of the auction, the Joint Venture's final bid of $49 million was the highest and best offer for the sale of the Debtor's inventory and IP. The Committee then

began its own negotiations with the Joint Venture to resolve its objection to the auction and sale. The Committee and the Joint Venture reached an agreement in principle on May 29, 2008, memorialized in a letter agreement ("the Settlement"). The UST objects to the Court's approval of the Settlement on the grounds that the Settlement is improper, unfairly favors the unsecured creditors, and contradicts the absolute priority rule. (D.I. 999).

On May 30, 2008, the Court approved the sale of the Debtor's inventory and IP to the Joint Venture. (D.I. 763). Thereafter, the Committee moved pursuant to Section 105(a) of the Bankruptcy Code and Rule 9019 of the Bankruptcy Rules for the Court's approval of the Settlement. (D.I. 907).

### B. The Letter Agreement

In the Settlement, the Committee agreed to (i) refrain from impeding the consummation of the sale transaction, including, without limitation, the filing or prosecution of its objection to the Sale and the filing or prosecution of an appeal or motion to reconsider the Sale; and (ii) waive the right to challenge the Joint Venture's conduct during the auction process or the reduction of its bid. In return, the Joint Venture agreed to fund a trust account for the exclusive benefit of the Debtor's general unsecured creditors in an amount equal to the lesser of (i) $500,000 and (ii) 10% of the gross royalties ultimately paid for the period of January 1, 2009 through December 31, 2009 in connection with the IP acquired from the Debtors in the sale transaction (excluding advances other than advances credited against royalties earned for calendar year 2009).

The Settlement was conditioned upon the approval of the Court. The Committee and the Joint Venture further agreed that the Settlement would be null and void if the Court did not approve the Settlement, meaning the Joint Venture would not be obligated to make any payment.

## DISCUSSION

### I. Does the Settlement Agreement Conflict with the Absolute Priority Rule of the Bankruptcy Code?

The Bankruptcy Code creates a hierarchy of claims enforced by adherence to what is referred to as the "absolute priority rule," and codified as part of the "fair and equitable" requirement of 11 U.S.C § 1129. The priority scheme applies to both chapter 7 and chapter 11 cases. *See* 11 U.S.C. §§ 507 (describing Code priorities), 726 (explaining distribution hierarchy in chapter 7), and 1129(a)(9) (detailing how priority claims are handled under a chapter 11). In a chapter 11 plan, unless the senior creditors agree otherwise, priority claims must be satisfied in full before junior claims are entitled to any distribution from the debtor's estate. 11 U.S.C. § 1129(b)(2)(B).

The appropriate starting point for the Court's analysis is the decision of the Third Circuit Court of Appeals in *In re Armstrong World Indus., Inc.*, 432 F.3d 507 (3d Cir. 2005).[3]

---

[3] A thorough and in-depth analysis and explanation of the development of the absolute priority rule and a discussion of *Armstrong* appears in Miller, H. and Berkovich, R., *The Implications of the Third Circuit's Armstrong Decision on Creative Restructuring: Will Strict Construction of the Absolute Priority Rule Make Chapter 11 Consensus Less Likely*, 55 Am.U.L.Rev. 1345 (2006). The article is critical of the constraints which *Armstrong* imposes on creditor negotiations. However, it is clear that *Armstrong* is not applicable in this case. The Settlement does not involve a gift from a creditor and is not connected to plan confirmation. *See* discussion, *infra*.

In *Armstrong*, a key provision to the plan of confirmation included the consent of the class of asbestos claimants to share a portion of its proposed distribution with equity holders. Thus, a junior class (equity) would receive debtors' property while a senior class (unsecured creditors) would not enjoy the full satisfaction of its claims. The Third Circuit, affirming the district court, denied confirmation on the basis that the proposed plan violated the absolute priority rule.

A lengthy discussion of the Settlement's adherence to the absolute priority rule is neither necessary nor appropriate here for the simple reason that the absolute priority rule is not violated in substance or spirit. *Armstrong* makes it clear that the absolute priority rule is violated when a senior class' portion of its share of estate property is allocated to a junior class over the objection of an intervening creditor class, as was the situation in *Armstrong*. Regardless of how one analyzes *Armstrong*, it is beyond cavil that *Armstrong* did not address a payment of property that did not belong to the estate by a non-creditor, here the Joint Venture, to a junior class outside of a plan of confirmation. In this case we are not dealing with estate property or with property to which a senior class was entitled or, for that matter, with a creditor or class of creditors making the payment.

It is true that if the Committee had filed its objection, and if the Committee had prevailed in convincing the Court to deny its approval of the Sale, the Joint Venture may have paid additional money to Debtor's estate. It is equally possible that the Court would have rejected the objection without the payment of any additional sum. Likewise, it is

possible that the Court would have denied the Sale because of the objection and that the Joint Venture would have abandoned the sale. We do not, of course, know what may have happened had the Committee not entered into the Settlement and instead advanced with its objection. What we do know is that there was an auction which did not result in a higher bid than the Joint Venture's bid, that no creditor objected to the Settlement and that the Committee did not receive estate property in the Settlement. The UST presented no evidence in support of the objection that the funds the Joint Venture agreed to pay in the Settlement were otherwise intended for the Debtor's estate.

In *Armstrong*, the Third Circuit affirmed the decision of the district court, *In re Armstrong World Industries, Inc.*, 320 B.R. 523 (D.Del. 2005).[4] The district court in *Armstrong World* distinguished what it found impermissible there from what had occurred in the case of *In re SPM Manufacturing Corp.*, 984 F.2d 1305 (1st Cir. 1983). In *SPM*, on appeal, the First Circuit Court of Appeals reversed decisions by the bankruptcy and district courts which had ruled that an agreement between a secured creditor and unsecured creditors' committee violated the policy of the Bankruptcy Code. The secured creditor agreed to share proceeds with the committee acting on behalf of the general unsecured creditors.

In *SPM*, the committee entered into an agreement with a creditor holding a perfected, first security interest, by which, in return for the "mutual cooperation . . . to maximize

---

[4] The Court will hereafter refer to the district court's decision which preceded *Armstrong* as "*Armstrong World,*" to distinguish the district court decision from the decision of the Third Circuit.

recovery of their respective debt . . . " the secured creditor and the Committee agreed to share in any proceeds received as a result of the reorganization or liquidation of the debtor. *SPM*, 984 F.2d at 1308. The bankruptcy court denied its approval of the sharing provision on the ground that it violated the absolute priority rule, and instead ordered the proceeds to be paid to the chapter 7 trustee to be distributed to other creditors in accordance with Bankruptcy Code priority rule. *Id.* at 1309. The First Circuit reversed, however, holding that as non-estate property, the secured creditor was entitled to do what it wished with the proceeds, without interference from the court. *Id* at 1314. Similarly, Chief Judge Mary Walrath, in *PSA Successor Corp.*, persuaded by the logic of the *SPM* Court, approved a settlement agreement between a secured lender and the committee for unsecured creditors, over the objection of the UST. *In re PSA Successor Corp.*, No. 04-13030 (Bkrtcy. D.Del., 2004). The committee objected to the sale and DIP facility of the chapter 11 plan. In return for a portion of the creditor's lien proceeds, the committee agreed to resolve its objections in order for the case to proceed. *Id.* Despite a high probability that the case would convert to chapter 7, Judge Walrath nonetheless approved the settlement, holding that a "secured creditor may give up part of its recovery to other creditors without concern for the priorities of the Bankruptcy Code."*Id.*

In contrast, in *Armstrong,* the Third Circuit affirmed the decision by the district court to deny a proposed chapter 11 plan on the ground that it violated the absolute priority rule. Under the proposed plan an unsecured creditor class would receive and automatically transfer

warrants to the holder of an equity interest in the event that its co-equal class rejects the reorganization. *Armstrong*, 432 F.3d. The court determined that "section 1129(b) was at least designed to address 'give-up' situations where a senior class gave estate property to a class junior to the dissenting class," and the proposed distribution scheme impermissibly sidestepped the carefully crafted rules of the Bankruptcy Code. *Id*. at 514.

Here, unlike *Armstrong,* the money to be paid to the Committee on behalf of general, unsecured creditors, is non-estate property. The Joint Venture's funds are not proceeds from a secured creditor's lien, do not belong to the estate, and will not become part of the estate even if the Court does not approve the Settlement. In addition, unlike *Armstrong*, there is no intervening creditor who objects to the Settlement. Neither the Debtor nor any creditor has objected to the Settlement.

Returning to *Armstrong World*, the district court distinguished *SPM* in a manner which justifies the Court's approval of the Settlement. In holding that a secured creditor may provide a carve out from its proposed recovery and direct payment to general unsecured creditors, the district court opined that:

> [R]ather than viewing a distribution of the debtor's property in contravention to the Bankruptcy Code's distribution scheme, the sharing agreement approved in *SPM* may be properly construed as an ordinary "carve out", "an agreement by a party secured by all or some of the assets of the estate to allow some portion of its lien proceeds to be paid to others [to secure their cooperation or to compensate priorities as part of cash collateral agreements.]" Unlike the Debtor in the instant case, the secured lender in *SPM* had a substantive right to dispose of its property, including the right to share the proceeds subject to its lien with other classes.

*Armstrong World*, 320 B.R. at 539 (citations omitted).  The district court acknowledged that there is a clear and permissible distinction when a party other than a debtor uses its funds to pay general unsecured creditors in contravention of the absolute priority rule.  In *SPM*, the donor was a secured creditor.  An even stronger case can be made when the funds come from a non-creditor such as, in this case, the Joint Venture.

This Court applied the rationale and followed the holding of *SPM* in *In re World Health Alternatives, Inc.*, 344 B.R. 291 (Bankr. D. Del. 2006), Judge Walsh approved a settlement in which the creditors' committee agreed to withdraw its objection to a sale motion in exchange, inter alia, for $1,625,000 for the benefit of general unsecured creditors.  The Court approved the settlement, holding that because, as here (and as in *SPM*), the Court was not addressing a plan of confirmation, the funds at issue would otherwise not have been available to the debtor's estate and the Bankruptcy Code did not prohibit the arrangement.  *World Health*, 344 B.R. at 297-99.

In summary, the Court is fully satisfied that the Settlement does not violate any provision of the Bankruptcy Code and that the law in this Circuit supports the conclusion.

## II.   Is the Committee a Proper Party to Negotiate and Seek Approval of a Settlement?

The UST's objection is also directed at the Committee's role in the Settlement.  First, the UST argues that the Committee does not have standing under Bankruptcy Rule 9019.  Second, the UST contends that the Committee did not honor its fiduciary duty which the UST views as owed to the Debtor's estate.  The Court does not agree.

### A. Rule 9019 Standing

The UST first argues that Bankruptcy Rule 9019 is not available to the Committee because Rule 9019 is available only to the "trustee" or debtor in possession and the Committee does not qualify as such. The UST further argues that the Committee's effort to utilize Section 105(a) of the Bankruptcy Code is unavailing because Section 105(a) does not provide an independent basis for approving the settlement but, rather, is an enabling statute only. In other cases addressing the substantive issue here, particularly *World Health*, the committee sought its settlement pursuant to Rule 9019. The Court is therefore satisfied that the Committee has the right pursuant to Bankruptcy Rule 9019 and Bankruptcy Code Section 105(a) to request the Court's approval of the Settlement. Moreover, as discussed below, the Settlement is in the best interest of the Debtor's estate as well as the general unsecured creditors.

### B. The Fairness of the Settlement

#### 1. The Committee's Duty

The UST takes issue with what it views as the Committee's self-dealing, taking "granted rights to challenge a proposed sale" and using those rights for its own benefit. Objection at 5-6. The UST, which is responsible for protecting the integrity of the bankruptcy process, contends that the Committee's right to challenge the Sale must inure to the benefit of Debtor's estate.

The Court is satisfied that the Committee's actions in achieving the Settlement were proper. The Committee owes its responsibility and duty to the class it represents *viz.*, the

general unsecured creditors of Debtor.

In *SPM*, the First Circuit rejected the argument that the creditors' committee owed a duty to "the estate as a whole." *SPM*, 984 F.2d at 1315. Rather, the *SPM* court ruled that:

> We do not accept this contention, as it seems based on the erroneous assumption that the Official Unsecured Creditors' Committee is a fiduciary for the estate as a whole. While a creditors' committee and its members must act in accordance with the provisions of the Bankruptcy court, <u>the committee is a fiduciary for those whom it represents, not for the debtor or the estate generally</u>. Thus the committee's fiduciary duty runs to the parties or class it represents. It is charged with pursuing whatever lawful course best serves the interests of the class of creditors represented.

*SPM*, 984 F.2d at 1315-16 (citations omitted, emphasis supplied).

### 2. **Fairness of the Settlement**

Settlement agreements are generally favored and, in fact encouraged, in bankruptcy proceedings, as they provide for an often needed and efficient resolution of the bankruptcy case. *Myers v. Martin* (*In re Martin*), 91 F.3d 389, 393 (3d Cir. 1996). The authority to approve a settlement is within the sound discretion of the court. *In re Key3Media Group, Inc.*, 336 B.R. 87,92 (Bankr. D.Del.2005). In approving a settlement, the court does not have to be convinced that the settlement is the best possible compromise. *Netlis v. Schugrue*, 165 B.R. 115, 123 (S.D.N.Y. 1994). Rather, the court must only conclude that "the compromise is fair, reasonable, and in the best interest of the estate." *In re Louise's, Inc.*, 211 B.R.798, 801 (D.Del. 1970). When considering whether a compromise is fair and equitable, a bankruptcy court should consider four criteria: (1) the probability of success in litigation; (2)

the estimate of the complexity of the litigation involved and the expense, inconvenience and delay necessarily attending it; (3) the likely difficulties in collecting on any judgment; and (4) all other factors relevant to a full and fair assessment of the wisdom of the proposed compromise. *See Protective Comm. for Indep. Stockbrokers of TMT Trailer Ferry*, 390 U.S. 414, 424 (1968); *In re Martin*, 91 F.3d at 393; *In re Nutraquest, Inc.* 434 F.3d 639, 644 (3d Cir. 2006). Basic to the process of evaluating a proposed settlement, then, is the "need to compare the terms of the compromise with the likely rewards of the litigation." *TMT Trailer Ferry*, 390 U.S. at 425. In other words, the settlement need only be "above the lowest point in the range of reasonableness." *In re Pa. Truck Lines, Inc. v. Pa. Truck Lines, Inc.*, 150 B.R. 595, 598 (E.D.Pa. 1992).

Applying the criteria set forth above, the Settlement is fair, reasonable, and in the best interest of the estate. The first factor, the probability of success, is satisfied because, as stated earlier, the probability for success of litigation was far from certain. Considering the possible outcomes, only one would have been advantageous to the Debtor, additional money being paid to the Debtor's estate. However, the expense the Debtor would incur to litigate any controversy would almost certainly have reduced, and quite possibly eliminated, the value of any gain. It is equally possible that the sale could have been denied and the Joint Venture abandoned the Sale, leaving the Debtor with limited financing to continue its operations until an alternative purchaser could be secured. Given the dire financial position the Debtor was in at the time, any delay in the sale of the Debtor's assets could have proven fatal. An expedited sale helped to maximize the value of the estate and ultimately the

payment to its creditors.

The second factor, the complexity, expense, inconvenience and delay of litigation, is satisfied because having to litigate the new value of the Debtor's assets would have been costly, protracted, and ultimately of little or no value to either the estate or its creditors. The settlement agreement allowed the sale process to proceed unencumbered by litigation. The estate thereby maximized its value and the general unsecured creditors maximized their return with non-estate property.

The third factor, the possible difficulties in the collection of any judgment, is really not an issue. However, the cost to the estate to secure any judgment may outweigh the value of a potential recovery.

The fourth factor, the wisdom of the Settlement, is satisfied because all other factors relevant to a full and fair assessment of the wisdom of the Settlement support its approval. The Settlement assured the sale would proceed as scheduled. This was in the best interest of the Debtor, the estate, and its creditors. In addition, the money given to the general unsecured creditors was non-estate money and only a small fraction of the value the estate received from the Sale. The Settlement paved the way for the mutual cooperation needed to bring about the Sale. Finally, given the precarious financial condition of the Debtor, there was little hope that any other alternative would have resulted in a more favorable result for the Debtor, the estate, its creditors, or any other party of interest.

**CONCLUSION**

For the reasons set forth above, the Court will grant the motion to approve the Settlement.

Dated: August 18, 2008

_____
KEVIN GROSS, U.S.B.J.